UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ANDRII BOHDAN,<br>VADIM ZHAVORONKOV,<br>VOLODYMYR NIKITIUK,<br>OREST CHEMERINSKYI,<br>VOLODYMYR BUCHINSKYI,<br>ANDRII KOPTSIUKH,<br>VOLODYMYR RYBCHENKO,<br>OLEH PYVOVAROV,<br>ILIA METELKIN,<br><br>Plaintiffs,<br><br>v.<br><br>RUN DIRECT, INC.,<br>RT GROUP LOGISTICS, INC.<br>TRANS SOLUTION, INC.,<br>NAZAR TRUKHAN,<br>VITALII ROPII,<br>YURIY ROPIY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No: |

**<u>CLASS ACTION COMPLAINT</u>**

Julia Bikbova, Attorney for Plaintiffs
Bikbova Law Offices, P.C.
666 Dundee Road, Suite 708
Northbrook, IL 60062
(847) 730-1800
julia@bikbovalaw.com
ARDC# 6291400

Table of Contents


I. NATURE OF THE CASE ..... 3

II. PARTIES ..... 4

III. JURISDICTION AND VENUE ..... 9

IV. RELEVANT STATUTES AND REGULATIONS ..... 10

V. STATEMENT OF FACTS ..... 13

VI. CLASS ALLEGATIONS ..... 43

VII. COUNT I: VIOLATIONS OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT, 820 ILCS 115/ – AGAINST ALL DEFENDANTS ..... 46

VIII. COUNT II, VIOLATIONS OF ILLINOIS MINIMUM WAGE LAW 820 ILCS §105/ET SEQ – AGAINST ALL DEFENDANTS ..... 50

IX. COUNT III: CIVIL CONSPIRACY TO COMMIT IWPCA VIOLATIONS, BROUGHT– AGAINST DEFENDANTS TRUKHAN, ROPII, AND ROPIY ..... 53

X. COUNT IV: All Plaintiffs against Individual Defendants Nazar Trukhan, Vitalii Ropii, and Yuriy Ropiy: CIVIL CONSPIRACY TO VIOLATE THE ILLINOIS MINIMUM WAGE LAW – 820 ILCS §105/et seq ..... 57

XI. COUNT V: VIOLATIONS OF FAIR LABOR STANDARD ACT, 29 U.S.C. 201 et Seq., Fair Labor Standard Act, 29 U.S.C. 201 et Seq.… ..... 59

XII. COUNT VI: CIVIL CONSPIRACY TO COMMIT FLSA VIOLATIONS, BROUGHT– AGAINST INDIVIDUAL DEFENDANTS TRUKHAN, ROPII, AND ROPIY ..... 62

Plaintiffs, Andrii Bohdan, Vadim Zhavoronkov, Volodymyr Nikitiuk, Orest Chemerinskyi, Volodymyr Buchinskyi, Andrii Koptsiukh, Volodymyr Rybchenko, Oleh Pyvovarov, Ilia Metelkin, individually and on behalf of all other similarly situated current and former employees of RUN DIRECT, INC., RT GROUP LOGISTICS, INC., TRANS SOLUTION, INC., NAZAR TRUKHAN, VITALII ROPII, and YURIY ROPIY by their attorney, bring their claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, Fair Labor Standard Act, 29 U.S.C. 201 et Seq. ("FLSA") and The Illinois Wage Payment and Collection Act, 820 ILCS § 115/ et Seq. ("IWPCA") against RUN DIRECT, INC., RT GROUP LOGISTICS, INC., TRANS SOLUTION, INC., NAZAR TRUKHAN, VITALII ROPII and YURIY ROPIY (collectively referred to as "Defendants"), and allege, upon personal belief as to himself and his own acts, and as for all other matters upon information and belief, and based upon the investigation made by his counsel, as follows:

## I. NATURE OF THE CASE

1. Plaintiffs worked as truck drivers for Defendant Companies RUN DIRECT, INC. (hereinafter "RUN DIRECT"), RT GROUP LOGISTICS, INC. (hereinafter "RT GROUP"), and TRANS SOLUTION, INC. (hereinafter "TRANS SOLUTION"), collectively referred to as "Defendant Companies" or "Corporate Defendants". Throughout their employment, they were misclassified as independent contractors, and consistently underpaid. Defendants made deductions from Plaintiffs' paychecks, which they did not consent to and were not alerted to beforehand.

2. By doing so, Defendant Companies – and the Individual Defendants Nazar Trukhan,Vitalii Ropii, and Yuriy Ropiy who controlled them and directed their policies of misclassification

of drivers and deductions – violated multiple provisions of the Illinois Wage Payment and Collections Act, 820 ILCS § 115/.

3. Similarly, Defendant Companies and Individual Defendants committed common law violations – namely, civil conspiracy to commit IWPCA and IMWL violations.

4. Plaintiffs bring this action on a class basis as to all causes of action and bases for relief, on behalf of all similarly situated drivers who worked or work at Defendant Companies or any related (sister, parent, subsidiary) companies. The violations experienced by Plaintiffs were not discrete occurrences, but constituted a business model for RUN DIRECT, RT GROUP and TRANS SOLUTION. The vast majority (if not all) of the truck drivers who worked or work for said companies were or are misclassified, underpaid, and subjected to illicit deductions.

**PARTIES**

5. Plaintiff Andrii Bohdan is a citizen of Ohio and worked as a truck driver in Illinois, compensated on a per mile basis as a non-exempt employee for Defendant Companies in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time Illinois employee within the meaning of the IWPCA, 820 ILCS § 115/2.

6. Plaintiff Vadim Zhavoronkov is a citizen of Indiana and worked as a truck driver in Illinois, compensated on a per mile basis, as a non-exempt employee for Defendant Companies in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time Illinois employee within the meaning of the IWPCA, 820 ILCS § 115/2.

7. Plaintiff Volodymyr Nikitiuk is a citizen of Michigan and worked as a truck driver in Illinois, compensated on a per mile basis, as a non-exempt employee for Defendant Companies in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time Illinois employee within the meaning of the IWPCA, 820 ILCS § 115/2.

8. Plaintiff Orest Chemerinskyi is a citizen of Pennsylvania and worked as a truck driver in Illinois, compensated on a per mile basis, as a non-exempt employee for Defendant Companies in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time Illinois employee within the meaning of the IWPCA, 820 ILCS § 115/2.

9. Plaintiff Volodymyr Buchinskyi is a citizen of Indiana and worked as a truck driver in Illinois, compensated on a per mile basis, as a non-exempt employee for Defendant Companies in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time Illinois employee within the meaning of the IWPCA, 820 ILCS § 115/2.

10. Plaintiff Andrii Koptsiukh who currently resides in Alberta, Canada, and who, while a citizen of Illinois, worked as a truck driver in Illinois, compensated on a per mile basis, as a non-exempt employee for Defendant Companies in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time Illinois employee within the meaning of the IWPCA, 820 ILCS § 115/2.

11. Plaintiff Volodymyr Rybchenko is a citizen of California and worked as a truck driver in Illinois, compensated on a per mile basis, as a non-exempt employee for Defendant Companies in the state of Illinois, during the applicable statute of limitations period, and

at all relevant times was a full time Illinois employee within the meaning of the IWPCA, 820 ILCS § 115/2.

12. Plaintiff Oleh Pyvovarov is a citizen of Texas and worked as a truck driver in Illinois, compensated on a per mile basis, as a non-exempt employee for Defendant Companies in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time Illinois employee within the meaning of the IWPCA, 820 ILCS § 115/2.

13. Plaintiff Ilia Metelkin is a citizen of New York and worked as a truck driver in Illinois, compensated on a per mile basis, as a non-exempt employee for Defendant Companies in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time Illinois employee within the meaning of the IWPCA, 820 ILCS § 115/2.

14. Plaintiffs bring this case on behalf of themselves and others who currently work, and who previously worked as truck drivers for Defendant Companies at any time during the relevant statute of limitations preceding the filing of the original complaint (hereinafter "Violation Period").

15. At all relevant times hereto, Defendant RUN DIRECT, INC. has been an Illinois corporation engaged in transportation and delivery business in Illinois and throughout the United States. RUN DIRECT conducts business in Illinois, and operates facilities in Illinois. Its principal place of business is 685 Helen Dr, Northbrook, IL 60062. Defendant RUN DIRECT has at all relevant times been an "employer" of Plaintiffs and other similarly situated truck drivers of Defendant Companies within the meaning of the IWPCA, 820 ILCS § 115/2.

16. At all relevant times hereto, RT GROUP LOGISTICS, INC. has been an Illinois corporation engaged in transportation and delivery business in Illinois and throughout the United States. Its principal place of business is 700 Chase Ave, Elk Grove Village, IL 60007. RT GROUP conducts business in Illinois and operates facilities in Illinois. RT GROUP has at all relevant times been an "employer" of Plaintiffs and other similarly situated employees of Defendant Companies within the meaning of the IWPCA, 820 ILCS §6 115/2.

17. At all times relevant hereto, RT GROUP LOGISTICS, INC., has been a corporation duly organized and existing under Illinois laws, acquired some of the business and assets of TRANS SOLUTION, INC., and assumed some of the debts, liabilities, and obligations of TRANS SOLUTION, INC. including all liabilities for damages claimed by the Plaintiffs herein. Nazar Trukhan,Vitalii Ropii, and Yuriy Ropiy are the shareholders of RT GROUP LOGISTICS, INC., formerly known as TRANS SOLUTION, INC. and have been its incorporators, founders, Presidents and officers from its inception through 2017.

18. At all relevant times hereto, Defendant TRANS SOLUTION, INC. has been an Illinois corporation engaged in transportation and delivery business in Illinois and throughout the United States. TRANS SOLUTION conducted business in Illinois, and operated facilities in Illinois. Its principal place of business was 24 Magnolia Ct, Putnam, IL 61560. Defendant TRANS SOLUTION has at all relevant times been an "employer" of Plaintiffs and other similarly situated truck drivers of Defendant Companies within the meaning of the IWPCA, 820 ILCS § 115/2.

19. Defendant Nazar Trukhan ("Individual Defendant Trukhan") is a citizen of the State of Illinois, and on information and belief, is the owner, registered agent, President, and

executive of RUN DIRECT, INC.; secretary and executive of RT GROUP LOGISTICS, INC., and owner and executive of TRANS SOLUTION, INC., and has been their incorporator and founder from their inception through to the present day. Defendant Trukhan was and is RUN DIRECT, RT GROUP and TRANS SOLUTION's key decision maker and their actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for the defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. As such, at all relevant times Defendant Trukhan has been an "employer" of Plaintiffs within the meaning of the IWPCA, 820 ILCS § 115/13. Defendant Trukhan caused or otherwise knowingly permitted RUN DIRECT, RT GROUP, and TRANS SOLUTION to violate the IWPCA

20. Defendant Vitalii Ropii ("Defendant Ropii") is a citizen of State of Illinois, and on information and belief, is the owner, secretary, and executive of RUN DIRECT, INC.; owner, President, registered agent, and executive of RT GROUP LOGISTICS, INC., and owner and executive of TRANS SOLUTION, INC. and has been their incorporator and founder from their inception through to the present day. Defendant Ropii was and is RUN DIRECT, RT GROUP and TRANS SOLUTION's key decision maker and its actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for the defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. As such, at all relevant times Defendant Ropii has been an "employer" of Plaintiffs within the meaning of the IWPCA, 820 ILCS § 115/13. Defendant Ropii caused or otherwise knowingly permitted RUN DIRECT, RT GROUP, and TRANS SOLUTION to violate the

IWPCA. Defendant Yuriy Ropiy ("Defendant Ropiy") is a citizen of State of Illinois, and on information and belief, is the executive of RUN DIRECT, INC., executive of RT GROUP LOGISTICS, INC., and owner, President, registered agent, and executive of TRANS SOLUTION, INC. and has been their incorporator and founder from their inception through to the present day. Defendant Yuriy Ropiy was and is RUN DIRECT, RT GROUP and TRANS SOLUTION's key decision maker and its actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for the defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. As such, at all relevant times Defendant Yuriy Ropiy has been an "employer" of Plaintiffs within the meaning of the IWPCA, 820 ILCS § 115/13. Defendant Yuriy Ropiy caused or otherwise knowingly permitted RUN DIRECT, RT GROUP, and TRANS SOLUTION to violate the IWPCA

## JURISDICTION AND VENUE

21. This court has personal jurisdiction over Plaintiffs and the class they seek to represent because the named Plaintiffs and the putative class members worked in the State of Illinois, including this judicial district, when employed by the Defendant Companies.

22. This Court has personal jurisdiction over the Corporate Defendants because the Corporate Defendants have their respective principal places of business in the State of Illinois, including this judicial district, and their conduct in the State of Illinois, including this judicial district, underlies all claims in this suit. The Individual Defendants are also citizens of Illinois and live in this judicial district.

23. At least one Plaintiff is diverse from at least one Defendant: Mr. Bohdan is a citizen of Ohio, while all Defendants are citizens of Illinois.

24. This Court has subject matter jurisdiction over the instant claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) as this matter is a civil action in which minimal diversity exists, the Plaintiffs' claims exceed $100,000, the matter in controversy exceeds the sum or value of $5,000,000 on class basis/in an aggregate, exclusive of interest and costs, and there are at least 1000 putative class members.

25. Some members of a putative class of plaintiffs are citizens of a State different from any defendant. At least two thirds of putative class members are citizens of states other than Illinois. Notwithstanding their citizenship, all Plaintiffs and putative class members worked for Defendant Companies in Illinois.

26. Venue is proper in this District pursuant to 28 U.S.C§ 1391(b)(2) because a substantial part of the events or omissions which gave rise to IWPCA violations occurred in the Northern District of Illinois.

**RELEVANT STATUTES AND REGULATIONS**

27. The Illinois Wage Payment and Collection Act (820 ILCS 115/) protects Illinois workers from misclassification, underpayment of wages and compensation, unauthorized deductions, and untimely payment of earned compensation. Just as other Illinois wage laws, the IWPCA is a public interest law.

28. Under Section 2 of the IWPCA, "For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2.

29. Under Section 3 of the IWPCA, "Every employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period." 820 ILCS 115/3.

30. Under Section 4 of the IWPCA, "All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. All wages earned by any employee during a weekly pay period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned. All wages paid on a daily basis shall be paid insofar as possible on the same day as the wages were earned, or not later in any event than 24 hours after the day on which the wages were earned." 820 ILCS 115/4.

31. Under Section 5 of the IWPCA, "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5.

32. Under Section 9 of the IWPCA, "Except as hereinafter provided, deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the time the deduction is made; (5) made by a municipality with a population of 500,000 or more . . . or (6) made by a housing authority in a municipality with a population of 500,000 or more..." 820 ILCS 115/9.

33. Under Section 9.5 of the IWPCA, "An employer shall reimburse an employee for all necessary expenditures or losses incurred by the employee within the employee's scope of employment and directly related to services performed for the employer. As used in this

Section, "necessary expenditures" means all reasonable expenditures or losses required of the employee in the discharge of employment duties and that inure to the primary benefit of the employer."

34. Under Section 10 of the IWPCA, "Employers shall notify employees, at the time of hiring, of the rate of pay and of the time and place of payment. Whenever possible, such notification shall be in writing and shall be acknowledged by both parties. Employers shall also notify employees of any changes in the arrangements, specified above, prior to the time of change." 820 ILCS 115/10.

35. Under Section 13 of the IWPCA, "In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13.

36. Under Section 14(a) of the IWPCA, "Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees. 820 ILCS 115/14.

37. Pursuant to Section 105/4a of IMWL, no employer shall employ any of his employees for a workweek of more than 40 hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than 1 1/2 times the regular rate at which he is employed. 820 ILCS 105/4a.

38. The Fair Labor Standards establishes minimum wage, overtime pay, recordkeeping, and youth employment standards affecting employees in the private sector and in Federal, State, and local governments.

39. Under 29 U.S. Code § 206, "Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates: (1)except as otherwise provided in this section, not less than— […] $7.25 an hour […] 29 U.S.C. § 206.

## STATEMENT OF FACTS

**Plaintiff Andrii Bohdan's employment**

40. During the time of Plaintiff Bohdan's employment with the Defendant Companies, he worked as a truck driver delivering goods across state lines.

41. Mr. Bohdan worked for RUN DIRECT as a truck driver for about nine months, between September 17, 2024 to June 18, 2025. He was hired by RUN DIRECT to work for RUN DIRECT and its related companies, and drove a truck with RUN DIRECT branding.

42. Andrii Bohdan learned of the truck driver position at Defendant Companies through a friend.

43. On September 17, 2024, RUN DIRECT's manager Raisa conducted an in-person interview with Mr. Bohdan. The interview took place at RUN DIRECT's office and yard in Illinois which, however, bore RT GROUP branding.

44. During Mr. Bohdan's interview, RUN DIRECT's staff told him that he would be driving a company truck that RUN DIRECT companies would provide, that he could not work for any other trucking company but Defendants' companies, and that this would be a full-time

commitment on his part. Mr. Bohdan was told that he would be paid on a per-mile basis, $0.70 per mile.

45. He was also told that the terms of employment dictate that he must regularly report to RUN DIRECT dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the RUN DIRECT's strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to RUN DIRECT staff and office in Illinois.

46. Defendant Companies' staff assured Plaintiff Bohdan that he always paid his drivers in full and on time.

47. Mr. Bohdan accepted the offer. He does not recall whether he signed any contracts at hiring. If he signed any paperwork at hiring, he was not given a copy of what he may have signed.

48. Throughout the course of his employment, Plaintiff Bohdan was underpaid for his work because deductions were applied to his pay. He was not aware of them and has not consented to any deductions. The Defendants refused to pay Plaintiff Bohdan for some work that he performed during the period of his employment from August 12, 2025 to September 15, 2025. Mr. Bohdan  was underpaid by at least $4,512. The deductions, in total, were in excess of $8,710.00.

49. For example, corporate Defendants deducted $172.00 "accidental occupational insurance", $150 "missing tarp", from each and every single paycheck one or more deductions were applied by the Defendant companies to Mr. Bohdan's pay, in total of $1,698.00.

50. Additionally, Mr. Bohdan was illegally charged an “escrow” or “deposit” of $2,500.00, which Defendants deducted from his pay upon the beginning of his employment (September 2024). Defendants never repaid this sum to Plaintiff Bohdan.

51. Further, Mr. Bohdan was not paid for all the miles he has driver for Defendant Companies because the Defendant Companies did not pay him based on “odometer” miles but based on “zip code to zip code” principle utilized by Defendant Companies, which typically undercut the actual miles driven by about 10%. Mr. Bohdan drove approximately 16,000 miles per month. Having worked for 9 months, 10% of unpaid miles at $0.70 per mile resulted at an approximate underpayment of $10,080 for the miles he has driven.

52. In total, Plaintiff Bohdan was underpaid by at least $18,790.00 during his 9 months of employment with RUN DIRECT.

53. Plaintiff Bohdan knows that all decisions regarding deductions from his pay, as well as other decisions as to his compensation were made personally by Mr. Trukhan and Mr. Ropii.

54. Under the IWPCA, and to the date of filing this complaint, $7,516.00 in statutory interest has accrued.

**Plaintiff Vadim Zhavoronkov’s employment**

55. During the time of Plaintiff Zhavoronkov’s employment with the Defendants, he worked as a truck driver delivering goods across state lines.

56. Mr. Zhavoronkov worked for TRANS SOLUTION and RUN DIRECT as a truck driver for about one year and 11 months, between October 2023 to September 2025. He was hired by TRANS SOLUTION to work for TRANS SOLUTION and its related companies, and drove a truck with TRANS SOLUTION branding. After the alleged dissolution of TRANS

SOLUTION in September 2024, Plaintiff Zhavoronkov was transferred to work for RUN DIRECT, and thereafter drove a truck bearing RUN DIRECT branding.

57. Vadim Zhavoronkov learned of this truck driver position through the internet ad.

58. On or about October 10, 2023, TRANS SOLUTION's representative Vladislav conducted telephone interview with Mr. Zhavoronkov.

59. After that, on October 19, 2023, Mr. Zhavoronkov attended an in-person interview with TRANS SOLUTION's fleet manager, Dmytro Gutsalyak, and safety managers at TRANS SOLUTION's office and yard in Illinois, which, however, bore RT GROUP branding.

60. During Mr. Zhavoronkov's interview, TRANS SOLUTION's staff told him that he would be driving a company truck that TRANS SOLUTION companies would provide, that he could not work for any other trucking company but Defendants' companies, and that this would be a full-time commitment on his part. Mr. Zhavoronkov was told that he would be paid on a per-mile basis, $0.65 per mile.

61. He was also told that he must regularly report to TRANS SOLUTION dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the company's strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to TRANS SOLUTION staff. After alleged dissolution of TRANS SOLUTION, Mr. Zhavoronkov was told that he must regularly report to RUN DIRECT dispatchers, but the staff of RUN DIRECT company was the same as in TRANS SOLUTION, and both companies used the same office and yard in Illinois.

62. Defendant Companies' staff assured Plaintiff Zhavoronkov that they always paid his drivers in full and on time. Indeed, Mr. Zhavoronkov had no reason to suspect that he would be misclassified, underpaid, and denied his promised compensation.

63. Mr. Zhavoronkov accepted the offer and does not recall whether he was required to sign any documents, and specifically, if he had to sign any contracts. If he did sign any contracts, he was not given a copy of what he may have signed.

64. Throughout the course of his employment, Plaintiff Zhavoronkov was underpaid for his work because deductions were applied to his pay. He was not aware of them and has not consented to any deductions. The deductions, in total, were in excess of $29,104.72.

65. For example, corporate Defendants deducted $172.00 "accidental occupational insurance", from each and every single paycheck one or more deductions were applied by the Defendant companies to Mr. Zhavoronkov's pay, in total of $3,956.00.

66. Moreover, Mr. Zhavoronkov was forced to buy his own truck navigator and spent about $550.

67. Additionally, Mr. Zhavoronkov was illegally charged an "escrow" or "deposit" of $2,500.00, which Defendants deducted from his pay upon the beginning of his employment (October 2023). Defendants never repaid this sum to Plaintiff Zhavoronkov.

68. The Defendants refused to pay Plaintiff Zhavoronkov for some work that he performed during the period of his employment from October 2023 to September 2025. Mr. Zhavoronkov was underpaid by at least $7,148.72.

69. In addition, Defendants paid Plaintiff Zhavoronkov for approximately 90% of the miles he actually drove. Defendant companies were using a "zip code to zip code" principle to calculate the miles to be paid for, as opposed to odometer miles that he actually drove. Mr.

Zhavoronkov typically drove about 10,000 miles per month, on average. Thus, depriving Mr. Zhavoronkov of at least $14,950 for unpaid miles.

70. In total, Plaintiff Zhavoronkov was underpaid at least $29,104.72 during the 23 months of his employment with TRANS SOLUTION and RUN DIRECT.

71. Plaintiff Zhavoronkov knew that all decisions about the deductions from his pay, and other decisions as to his compensation were made personally by Mr. Trukhan and Mr. Ropii.

72. In the time since, $7,276.18 in statutory interest under the IWPCA has accrued.

**<u>Plaintiff Volodymyr Nikitiuk's employment</u>**

73. During the time of Plaintiff Nikitiuk's employment with the Defendant Companies, he worked as a truck driver delivering goods across state lines.

74. Mr. Nikitiuk worked for TRANS SOLUTION and RUN DIRECT as a truck driver for about 1 year and 4 months, between February 3, 2024 to June 4, 2025. He was hired by TRANS SOLUTION to work for TRANS SOLUTION and its related companies, and drove a truck with TRANS SOLUTION branding. After the alleged dissolution of TRANS SOLUTION in September 2024, Plaintiff Nikitiuk was transferred to work for RUN DIRECT, and thereafter drove a truck bearing RUN DIRECT branding.

75. Volodymyr Nikitiuk learned of the truck driver position at Defendant Companies through a recommendation from other trucking company's staff.

76. During the third week of January of 2024, TRANS SOLUTION's representative Vladislav conducted telephone interview with Mr. Nikitiuk.

77. After that, on January 29, 2024, Mr. Nikitiuk attended an in-person interview with TRANS SOLUTION's representative, Aleksandr, and manager Tatiana at TRANS SOLUTION's office and yard in Illinois, which, however, bore RT GROUP branding.

78. During Mr. Nikitiuk's interview, TRANS SOLUTION's staff told him that he would be driving a company truck that TRANS SOLUTION companies would provide, that he could not work for any other trucking company but Defendants' companies, and that this would be a full-time commitment on his part. Mr. Nikitiuk was also told that, as a new truck driver without experience, he would start working as a truck driver for TRANS SOLUTION and, after acquiring some experience, would be transferred to RUN DIRECT, which has newer trucks. Mr. Nikitiuk was told that he would be paid on a per-mile basis, $0.65 per mile.

79. He was also told that the terms of employment dictate that he must regularly report to TRANS SOLUTION dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the TRANS SOLUTION's strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to TRANS SOLUTION staff and office in Illinois.

80. Defendant Companies' staff assured Plaintiff Nikitiuk that he always paid his drivers in full and on time.

81. Mr. Nikitiuk accepted the offer. He does not recall whether he signed any contracts at hiring. If he signed any paperwork at hiring, he was not given a copy of what he may have signed.

82. Throughout the course of his employment, Plaintiff Nikitiuk was underpaid for his work because deductions were applied to his pay. He was not aware of them and has not consented to any deductions. The Defendants refused to pay Plaintiff Nikitiuk for some work that he performed during the period of his employment from February 3, 2024 to June 4, 2025. Mr. Nikitiuk was underpaid by at least $6,329.

83. The deductions, in total, were in excess of $27,261.00.

84. For example, corporate Defendants deducted $172.00 "accidental occupational insurance", from each and every single paycheck one or more deductions were applied by the Defendant companies to Mr. Nikitiuk's pay, in total of $2,752.00.

85. Additionally, Mr. Nikitiuk was illegally charged an "escrow" or "deposit" of $2,500.00, which Defendants deducted from his pay upon the beginning of his employment (February 2024). Defendants never repaid this sum to Plaintiff Nikitiuk.

86. Further, Mr. Nikitiuk was not paid for all the miles he has driver for Defendant Companies because the Defendant Companies did not pay him based on "odometer" miles but based on "zip code to zip code" principle utilized by Defendant Companies, which typically undercut the actual miles driven by about 10%. Mr. Nikitiuk drove approximately 14,000 miles per month. Having worked for 1 year 4 months, 10% of unpaid miles at $0.70 per mile resulted at an approximate underpayment of $15,680 for the miles he has driven.

87. In total, Plaintiff Nikitiuk was underpaid by at least $27,261.00 during his 1 year and 4 months of employment with TRANS SOLUTION and RUN DIRECT.

88. Plaintiff Nikitiuk knows that all decisions regarding deductions from his pay, as well as other decisions as to his compensation were made personally by Mr. Trukhan and Mr. Ropii.

89. Under the IWPCA, and to the date of filing this complaint, $10,904.40 in statutory interest has accrued.

**<u>Plaintiff Orest Chemerinskyi's employment</u>**

90. During the time of Plaintiff Chemerinskyi's employment with the Defendant Companies, he worked as a truck driver delivering goods across state lines.

91. Mr. Chemerinskyi worked for TRANS SOLUTION and RUN DIRECT as a truck driver for about one year and 7 months, between February 7, 2024 to September 6, 2025. He was hired by TRANS SOLUTION to work for TRANS SOLUTION and its related companies, and drove a truck with TRANS SOLUTION branding. After the alleged dissolution of TRANS SOLUTION in September 2024, Plaintiff Chemerinskyi was transferred to work for RUN DIRECT, and thereafter drove a truck bearing RUN DIRECT branding.

92. Orest Chemerinskyi learned of this truck driver position through his friend.

93. On or about February 2, 2024, Mr. Chemerinskyi attended an in-person interview with TRANS SOLUTION's fleet manager, Dmytro Gutsalyak, and safety managers at TRANS SOLUTION's office and yard in Illinois, which, however, bore RT GROUP branding.

94. During Mr. Chemerinskyi's interview, TRANS SOLUTION's staff told him that he would be driving a company truck that TRANS SOLUTION companies would provide, that he could not work for any other trucking company but Defendants' companies, and that this would be a full-time commitment on his part. Mr. Chemerinskyi was told that he would be paid on a per-mile basis, $0.65 per mile for first month of employment and $0.70 after first month.

95. He was also told that he must regularly report to TRANS SOLUTION dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the company's strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to TRANS SOLUTION staff. After alleged dissolution of TRANS SOLUTION, Mr. Chemerinskyi was told that he must regularly report to RUN DIRECT dispatchers, but the staff of RUN

DIRECT company was the same as in TRANS SOLUTION, and both companies used the same office and yard in Illinois.

96. Defendant Companies' staff assured Plaintiff Chemerinskyi that they always paid his drivers in full and on time. Indeed, Mr. Chemerinskyi had no reason to suspect that he would be misclassified, underpaid, and denied his promised compensation.

97. Mr. Chemerinskyi accepted the offer and does not recall whether he was required to sign any documents, and specifically, if he had to sign any contracts. If he did sign any contracts, he was not given a copy of what he may have signed.

98. Throughout the course of his employment, Plaintiff Chemerinskyi was underpaid for his work because deductions were applied to his pay. He was not aware of them and has not consented to any deductions. The deductions, in total, were in excess of $32,564.

99. For example, corporate Defendants deducted $172.00 "accidental occupational insurance", from each and every single paycheck one or more deductions were applied by the Defendant companies to Mr. Chemerinskyi's pay. Mr. Chemerinskyi was underpaid by at least $3,268 for deducted insurance.

100. Additionally, Mr. Chemerinskyi was illegally charged an "escrow" or "deposit" of $2,500.00, which Defendants deducted from his pay upon the beginning of his employment (February 2024). Defendants never repaid this sum to Plaintiff Chemerinskyi.

101. The Defendants refused to pay Plaintiff Chemerinskyi for some work that he performed during the period of his employment. Mr. Chemerinskyi was underpaid by at least $9,506.

102. In addition, Defendants paid Plaintiff Chemerinskyi for approximately 90% of the miles he actually drove. Defendant companies were using a "zip code to zip code" principle to calculate the miles to be paid for, as opposed to odometer miles that he actually drove. Mr.

Chemerinskyi typically drove about 13,000 miles per month, on average. Thus, depriving Mr. Chemerinskyi of at least $17,290 for unpaid miles.

103. In total, Plaintiff Chemerinskyi was underpaid at least $32,564 during the 19 months of his employment with TRANS SOLUTION and RUN DIRECT.

104. Plaintiff Chemerinskyi knew that all decisions about the deductions from his pay, and other decisions as to his compensation were made personally by Mr. Trukhan and Mr. Ropii.

105. In the time since, $8,141.00 in statutory interest under the IWPCA has accrued.

**Plaintiff Volodymyr Buchinskyi's employment**

106. During the time of Plaintiff Buchinskyi's employment with the Defendant Companies, he worked as a truck driver delivering goods across state lines.

107. Mr. Buchinskyi worked for TRANS SOLUTION and RUN DIRECT as a truck driver for about one year and 11 months, between June 23, 2023 to May 23, 2025. He was hired by TRANS SOLUTION to work for TRANS SOLUTION and its related companies, and drove a truck with TRANS SOLUTION branding. After the alleged dissolution of TRANS SOLUTION in September 2024, Plaintiff Buchinskyi was transferred to work for RUN DIRECT in March 2025, and thereafter drove a truck bearing RUN DIRECT branding.

108. Volodymyr Buchinskyi learned of this truck driver position through his friend.

109. In the mid-June 2023, TRANS SOLUTION's representative conducted telephone interview with Mr. Buchinskyi. Representative sent conditions of employment, 75 cents per mile, drive 10-11 hours, layover, stop pay, tarp pay, safety bonuses.

110. After that, on June 21, 2023, Mr. Buchinskyi attended an in-person interview with TRANS SOLUTION's representative, fleet manager Dmytro Gutsalyak, and manager

Roman Gyzhka at TRANS SOLUTION's office and yard in Illinois, which, however, bore RT GROUP branding.

111. During Mr. Buchinskyi's interview, TRANS SOLUTION's staff told him that he would be driving a company truck that TRANS SOLUTION companies would provide, that he could not work for any other trucking company but Defendants' companies, and that this would be a full-time commitment on his part. Mr. Buchinskyi was told that he would be paid on a per-mile basis, $0.70 per mile for first year of employment. Said drive 10-11 hours per day, but hint that can treat logbooks.

112. He was also told that he must regularly report to TRANS SOLUTION dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the company's strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to TRANS SOLUTION staff. After alleged dissolution of TRANS SOLUTION, Mr. Buchinskyi was told that he must regularly report to RUN DIRECT dispatchers, but the staff of RUN DIRECT company was the same as in TRANS SOLUTION, and both companies used the same office and yard in Illinois.

113. Defendant Companies' staff assured Plaintiff Buchinskyi that they always paid his drivers in full and on time. Indeed, Mr. Buchinskyi had no reason to suspect that he would be misclassified, underpaid, and denied his promised compensation.

114. Mr. Buchinskyi accepted the offer and does not recall whether he was required to sign any documents, and specifically, if he had to sign any contracts. If he did sign any contracts, he was not given a copy of what he may have signed.

115. Throughout the course of his employment, Plaintiff Buchinskyi was underpaid for his work because deductions were applied to his pay. He was not aware of them and has not consented to any deductions. The deductions, in total, were in excess of $29.913.72.

116. For example, corporate Defendants deducted $172.00 "accidental occupational insurance", from each and every single paycheck one or more deductions were applied by the Defendant companies to Mr. Buchinskyi's pay. Mr. Buchinskyi was underpaid by at least $3,956 for deducted insurance.

117. Additionally, Mr. Buchinskyi was illegally charged an "escrow" or "deposit" of $2,500.00, which Defendants deducted from his pay upon the beginning of his employment (June 2023). Defendants never repaid this sum to Plaintiff Buchinskyi, but provided statement that Plaintiff reimbursed.

118. Additionally, Mr. Buchinskyi was illegally charged a "Attoeny fee case#314162 deduction#1"; "AttorneyCase_#314162 citation payment"; "DOT Inspection_#ORAABX001215 with violation"; "#341cargo/ moved the trailer while still loading, the pallet fell off #1"; "#341cargo/ moved the trailer while still loading, the pallet fell off #2"; "#341cargo/ moved the trailer while still loading, the pallet fell off #3"; "#341cargo/ moved the trailer while still loading, the pallet fell off #4"; "#341cargo/ moved the trailer while still loading, the pallet fell off #5"; and "DOT inspection 03.05.2024 WA2127000108 level III , failed to obey traffic control 5 p." in total of $2,659.88.

119. The Defendants refused to pay Plaintiff Buchinskyi for some work that he performed during the period of his employment. Mr. Buchinskyi was underpaid by at least $1,477.84.

120. In addition, Defendants paid Plaintiff Buchinskyi for approximately 90% of the miles he actually drove. Defendant companies were using a "zip code to zip code" principle to calculate the miles to be paid for, as opposed to odometer miles that he actually drove. Mr. Buchinskyi typically drove about 12,000 miles per month, on average. Thus, depriving Mr. Buchinskyi of at least $19,320 for unpaid miles.

121. In total, Plaintiff Buchinskyi was underpaid at least $29,913.72 during the 23 months of his employment with TRANS SOLUTION and RUN DIRECT.

122. Plaintiff Buchinskyi knew that all decisions about the deductions from his pay, and other decisions as to his compensation were made personally by Mr. Trukhan and Mr. Ropii.

123. In the time since, $13,461.17 in statutory interest under the IWPCA has accrued.

**Plaintiff Andrii Koptsiukh's employment**

124. During the time of Plaintiff Koptsiukh's employment with the Defendant Companies, he worked as a truck driver delivering goods across state lines.

125. Mr. Koptsiukh worked for TRANS SOLUTION and RUN DIRECT as a truck driver for about one year and 2 months, between June 2024 to August 2025. He was hired by TRANS SOLUTION to work for TRANS SOLUTION and its related companies, and drove a truck with TRANS SOLUTION branding. After the alleged dissolution of TRANS SOLUTION in September 2024, Plaintiff Koptsiukh was transferred to work for RUN DIRECT in March 2025, and thereafter drove a truck bearing RUN DIRECT branding.

126. Mr. Koptsiukh learned of this truck driver position through his friend.

127. In the June 2024, TRANS SOLUTION's representative conducted telephone interview with Mr. Koptsiukh and scheduled in-person meeting.

128. After that, on June 2024, Mr. Koptsiukh attended an in-person interview with TRANS SOLUTION's representative, manager Roman Gyzhka at TRANS SOLUTION's office and yard in Illinois, which, however, bore RT GROUP branding.

129. During Mr. Koptsiukh's interview, TRANS SOLUTION's staff told him that he would be driving a company truck that TRANS SOLUTION companies would provide, that he could not work for any other trucking company but Defendants' companies, and that this would be a full-time commitment on his part. Mr. Koptsiukh was told that he would be paid on a per-mile basis, $0.70 per mile for first year of employment. Said drive 10-11 hours per day, but hint that can treat logbooks.

130. He was also told that he must regularly report to TRANS SOLUTION dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the company's strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to TRANS SOLUTION staff. After alleged dissolution of TRANS SOLUTION, Mr. Koptsiukh was told that he must regularly report to RUN DIRECT dispatchers, but the staff of RUN DIRECT company was the same as in TRANS SOLUTION, and both companies used the same office and yard in Illinois.

131. Defendant Companies' staff assured Plaintiff Koptsiukh that they always paid his drivers in full and on time. Indeed, Mr. Koptsiukh had no reason to suspect that he would be misclassified, underpaid, and denied his promised compensation.

132. Mr. Koptsiukh accepted the offer and does not recall whether he was required to sign any documents, and specifically, if he had to sign any contracts. If he did sign any contracts, he was not given a copy of what he may have signed.

133. Throughout the course of his employment, Plaintiff Koptsiukh was underpaid for his work because deductions were applied to his pay. He was not aware of them and has not consented to any deductions. The deductions, in total, were in excess of $22,271.81.

134. For example, corporate Defendants deducted $172.00 "accidental occupational insurance", from each and every single paycheck one or more deductions were applied by the Defendant companies to Mr. Koptsiukh's pay. Mr. Koptsiukh was underpaid by at least $2,408 for deducted insurance.

135. Additionally, Mr. Koptsiukh was illegally charged an "escrow" or "deposit" of $2,500.00, which Defendants deducted from his pay upon the beginning of his employment (June 2024). Defendants never repaid this sum to Plaintiff Koptsiukh, but provided statement that Plaintiff reimbursed.

136. The Defendants refused to pay Plaintiff Koptsiukh for some work that he performed during the period of his employment. Mr. Koptsiukh was underpaid by at least $4,623.81.

137. In addition, Defendants paid Plaintiff Koptsiukh for approximately 90% of the miles he actually drove. Defendant companies were using a "zip code to zip code" principle to calculate the miles to be paid for, as opposed to odometer miles that he actually drove. Mr. Koptsiukh typically drove about 13,000 miles per month, on average. Thus, depriving Mr. Koptsiukh of at least $12,740 for unpaid miles.

138. In total, Plaintiff Koptsiukh was underpaid at least $22,271.81 during the 14 months of his employment with TRANS SOLUTION and RUN DIRECT.

139. Plaintiff Koptsiukh knew that all decisions about the deductions from his pay, and other decisions as to his compensation were made personally by Mr. Trukhan and Mr. Ropii.

140. In the time since, $6,681.54 in statutory interest under the IWPCA has accrued.

**Plaintiff Volodymyr Rybchenko's employment**

141. During the time of Plaintiff Rybchenko's employment with the Defendant Companies, he worked as a truck driver delivering goods across state lines.

142. Mr. Rybchenko worked for RUN DIRECT as a truck driver for about four months, between August 2025 to December 15, 2025. He was hired by RUN DIRECT to work for RUN DIRECT and its related companies, and drove a truck with RUN DIRECT branding.

143. Volodymyr Rybchenko learned of the truck driver position at Defendant Companies through a friend.

144. On mid-August 2025, RUN DIRECT's fleet manager Dmytro Gutsalyak conducted an in-person interview with Mr. Rybchenko. The interview took place at RUN DIRECT's office and yard in Illinois.

145. During Mr. Rybchenko's interview, RUN DIRECT's staff told him that he would be driving a company truck that RUN DIRECT companies would provide, that he could not work for any other trucking company but Defendants' companies, and that this would be a full-time commitment on his part. Mr. Rybchenko was told that he would be paid on a per-mile basis, $0.70 per mile. Said drive 10-11 hours per day, but hint that can treat logbooks.

146. He was also told that the terms of employment dictate that he must regularly report to RUN DIRECT dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the RUN DIRECT's strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to RUN DIRECT staff and office in Illinois.

147. Defendant Companies' staff assured Plaintiff Rybchenko that he always paid his drivers in full and on time.

148. Mr. Rybchenko accepted the offer. He does not recall whether he signed any contracts at hiring. If he signed any paperwork at hiring, he was not given a copy of what he may have signed.

149. Throughout the course of his employment, Plaintiff Rybchenko was underpaid for his work because deductions were applied to his pay. He was not aware of them and has not consented to any deductions. The Defendants refused to pay Plaintiff Rybchenko for some work that he performed during the period of his employment from August 12, 2025 to September 15, 2025. Mr. Rybchenko was underpaid for his work in amount of $6,976. Deductions, in total, were in excess of $13,308.00.

150. For example, corporate Defendants deducted $172.00 "accidental occupational insurance", and $16.00 "passenger insurance", from each and every single paycheck one or more deductions were applied by the Defendant companies to Mr. Rybchenko's pay. Mr. Rybchenko was underpaid by at least $752 for deducted insurance.

151. Additionally, Mr. Rybchenko was illegally charged an "escrow" or "deposit" of $2,500.00, which Defendants deducted from his pay upon the beginning of his employment (August 2025). Defendants never repaid this sum to Plaintiff Rybchenko.

152. Further, Mr. Rybchenko was not paid for all the miles he has driver for Defendant Companies because the Defendant Companies did not pay him based on "odometer" miles but based on "zip code to zip code" principle utilized by Defendant Companies, which typically undercut the actual miles driven by about 10%. Mr. Rybchenko drove approximately 11,000 miles per month. Having worked for 4 months, 10% of unpaid miles at $0.70 per mile resulted at an approximate underpayment of $3,080 for the miles he has driven.

153. In total, Plaintiff Rybchenko was underpaid by at least $18,790.00 during his 4 months of employment with RUN DIRECT.

154. Plaintiff Rybchenko knows that all decisions regarding deductions from his pay, as well as other decisions as to his compensation were made personally by Mr. Trukhan and Mr. Ropii.

155. Under the IWPCA, and to the date of filing this complaint, $1,330.80 in statutory interest has accrued.

**Plaintiff Oleh Pyvovarov's employment**

156. During the time of Plaintiff Pyvovarov's employment with the Defendant Companies, he worked as a truck driver delivering goods across state lines.

157. Mr. Pyvovarov worked for TRANS SOLUTION as a truck driver for about 4 months, between January 22, 2024 to May 30, 2024. He was hired by TRANS SOLUTION to work for TRANS SOLUTION and its related companies, and drove a truck with TRANS SOLUTION branding.

158. Oleh Pyvovarov learned of this truck driver position through his friend.

159. In the January 2024, TRANS SOLUTION's representative conducted telephone interview with Mr. Pyvovarov and scheduled in-person meeting.

160. After that, on January 2024, Mr. Pyvovarov attended an in-person interview with TRANS SOLUTION's representative, fleet managers Dmytro Gutselyak and Roman Gyzhka at TRANS SOLUTION's office and yard in Illinois, which, however, bore RT GROUP branding.

161. During Mr. Pyvovarov's interview, TRANS SOLUTION's staff told him that he would be driving a company truck that TRANS SOLUTION companies would provide, that he

could not work for any other trucking company but Defendants' companies, and that this would be a full-time commitment on his part. Mr. Pyvovarov was told that he would be paid on a per-mile basis, $0.65 per mile for first year of employment. Said drive 10-11 hours per day, but hint that can treat logbooks after he accrues enough experience.

162. As a new driver, Mr. Pyvovarov was told that he would be hired by TRANS SOLUTION, because RUN DIRECT is reserved for experienced truck drivers.

163. He was also told that he must regularly report to TRANS SOLUTION dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the company's strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to TRANS SOLUTION staff. After alleged dissolution of TRANS SOLUTION, Mr. Pyvovarov was told that he must regularly report to RUN DIRECT dispatchers, but the staff of RUN DIRECT company was the same as in TRANS SOLUTION, and both companies used the same office and yard in Illinois.

164. Defendant Companies' staff assured Plaintiff Pyvovarov that they always paid his drivers in full and on time. Indeed, Mr. Pyvovarov had no reason to suspect that he would be misclassified, underpaid, and denied his promised compensation.

165. Mr. Pyvovarov accepted the offer and does not recall whether he was required to sign any documents, and specifically, if he had to sign any contracts. If he did sign any contracts, he was not given a copy of what he may have signed.

166. Throughout the course of his employment, Plaintiff Pyvovarov was underpaid for his work because deductions were applied to his pay. He was not aware of them and has not consented to any deductions. The deductions, in total, were in excess of $5,960.

167. For example, corporate Defendants deducted $172.00 "accidental occupational insurance", from each and every single paycheck one or more deductions were applied by the Defendant companies to Mr. Pyvovarov's pay. Mr. Pyvovarov was underpaid by at least $860 for deducted insurance.

168. Additionally, Mr. Pyvovarov was illegally charged an "escrow" or "deposit" of $2,500.00, which Defendants deducted from his pay upon the beginning of his employment (January 2024). Defendants never repaid this sum to Plaintiff Pyvovarov.

169. In addition, Defendants paid Plaintiff Pyvovarov for approximately 90% of the miles he actually drove. Defendant companies were using a "zip code to zip code" principle to calculate the miles to be paid for, as opposed to odometer miles that he actually drove. Mr. Pyvovarov typically drove about 10,000 miles per month, on average. Thus, depriving Mr. Pyvovarov of at least $2,600 for unpaid miles.

170. In total, Plaintiff Pyvovarov was underpaid at least $5,960 during the 4 months of his employment with TRANS SOLUTION and RUN DIRECT.

171. Plaintiff Pyvovarov knew that all decisions about the deductions from his pay, and other decisions as to his compensation were made personally by Mr. Trukhan and Mr. Ropii.

172. In the time since, $6,258 in statutory interest under the IWPCA has accrued

**<u>Plaintiff Ilia Metelkin's employment</u>**

173. During the time of Plaintiff Metelkin's employment with the Defendant Companies, he worked as a truck driver delivering goods across state lines.

174. Mr. Metelkin worked for TRANS SOLUTION and RUN DIRECT as a truck driver for about one year and 1 month, between May 2024 to June 16, 2025. He was hired by TRANS SOLUTION to work for TRANS SOLUTION and its related companies, and drove a truck

with TRANS SOLUTION branding. After the alleged dissolution of TRANS SOLUTION in September 2024, Plaintiff Metelkin was transferred to work for RUN DIRECT in March 2025, and thereafter drove a truck bearing RUN DIRECT branding.

175. Ilia Metelkin learned of this truck driver position through online advertisement.

176. In the May 2024, TRANS SOLUTION's representative conducted telephone interview with Mr. Metelkin and scheduled in-person meeting.

177. After that, on May 2024, Mr. Metelkin attended an in-person interview with TRANS SOLUTION's representative, fleet managers Aziz, Dmytro Gutselyak and Roman Gyzhka, and HR manager Oksana at TRANS SOLUTION's office and yard in Illinois, which, however, bore RT GROUP branding.

178. During Mr. Metelkin's interview, TRANS SOLUTION's staff told him that he would be driving a company truck that TRANS SOLUTION companies would provide, that he could not work for any other trucking company but Defendants' companies, and that this would be a full-time commitment on his part. Mr. Metelkin was told that he would be paid on a per-mile basis, $0.65 per mile for first year of employment. Said drive 10-11 hours per day, but hint that can treat logbooks.

179. He was also told that he must regularly report to TRANS SOLUTION dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the company's strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to TRANS SOLUTION staff. After alleged dissolution of TRANS SOLUTION, Mr. Metelkin was told that he must regularly report to RUN DIRECT dispatchers, but the staff of RUN

DIRECT company was the same as in TRANS SOLUTION, and both companies used the same office and yard in Illinois.

180. Defendant Companies' staff assured Plaintiff Chemerinskyi that they always paid his drivers in full and on time. Indeed, Mr. Metelkin had no reason to suspect that he would be misclassified, underpaid, and denied his promised compensation.

181. Mr. Metelkin accepted the offer and does not recall whether he was required to sign any documents, and specifically, if he had to sign any contracts. If he did sign any contracts, he was not given a copy of what he may have signed.

182. Throughout the course of his employment, Plaintiff Metelkin was underpaid for his work because deductions were applied to his pay. He was not aware of them and has not consented to any deductions. The deductions, in total, were in excess of $19,071.64.

183. For example, corporate Defendants deducted $172.00 "accidental occupational insurance", from each and every single paycheck one or more deductions were applied by the Defendant companies to Mr. Metelkin's pay. Mr. Metelkin was underpaid by at least $2,236 for deducted insurance.

184. Additionally, Mr. Metelkin was illegally charged a "Damaged another truck/236 truck" in total of $2,179.90.

185. Additionally, Mr. Metelkin was illegally charged an "escrow" or "deposit" of $2,500.00, which Defendants deducted from his pay upon the beginning of his employment (May 2024). Defendants never repaid this sum to Plaintiff Metelkin.

186. The Defendants refused to pay Plaintiff Metelkin for some work that he performed during the period of his employment. Mr. Metelkin was underpaid by at least $2,015.74.

187. In addition, Defendants paid Plaintiff Metelkin for approximately 90% of the miles he actually drove. Defendant companies were using a "zip code to zip code" principle to calculate the miles to be paid for, as opposed to odometer miles that he actually drove. Mr. Metelkin typically drove about 12,000 miles per month, on average. Thus, depriving Mr. Metelkin of at least $10,140 for unpaid miles.

188. In total, Plaintiff Metelkin was underpaid at least $19,071.64 during the 13 months of his employment with TRANS SOLUTION and RUN DIRECT.

189. Plaintiff Metelkin knew that all decisions about the deductions from his pay, and other decisions as to his compensation were made personally by Mr. Trukhan and Mr. Ropii.

190. In the time since, $7,628.66 in statutory interest under the IWPCA has accrued

**Defendant Companies' control over Plaintiffs' employment**

191. Defendant Nazar Trukhan,Defendant Vitalii Ropii, and Defendant Yuriy Ropiy and other personnel of Defendant Companies managed all of the Plaintiffs' and others' similarly situated drivers' work for Defendant Companies, including the number of hours worked, the distances driven, and the tasks performed by Plaintiffs and others similarly situated truck drivers.

192. Defendants Trukhan,Ropii, and Yuriy Ropiy, and other personnel of Defendant Companies exerted full control over Plaintiffs' workdays and working conditions. They dictated, controlled and ratified the wages paid, hours worked, tasks set, and all related employee compensation policies and practices for all drivers working for RUN DIRECT, TRANS SOLUTION and RT GROUP.

193. Defendants also required the Plaintiffs and all other similarly situated truck drivers to submit to mandatory drug testing in nearby Illinois facilities in order to commence

employment. These were mandatory conditions of employment, which Plaintiffs had to fulfill in order to work for Defendant Companies.

194. Plaintiffs and members of the putative class were required to come to Defendant companies' office in Illinois for interviews, completion of hiring process and paperwork, attend orientation as to the use of equipment and policies of the Defendant Companies, meet key personnel and take possession of equipment.

195. Defendants Trukhan,Ropii, and Yuriy Ropiy as well as other members of a management team at RUN DIRECT, TRANS SOLUTION and RT GROUP, required Plaintiffs and other similarly situated drivers to use the Defendant companies' vehicles in performance of their duties, which displayed RUN DIRECT, TRANS SOLUTION and RT GROUP signs on the vehicle siding; those companies branding is solely owned and managed by Defendants Trukhan,Ropii, and Yuriy Ropiy.

196. As a result, Plaintiffs and similarly situated drivers exclusively drove and operated RUN DIRECT's, TRANS SOLUTION's and RT GROUP's vehicles and exclusively under these three companies' DOT Motor Carrier Authority. The requirement of displaying Defendant Companies' signs, branding and DOT MC numbers was equally imposed on all drivers as a condition of employment.

197. At least approximately 10% of the cargo that the Defendant Companies required the Plaintiffs and putative class members to transport was cargo deliveries to and from the Defendants' customers located in Illinois. In furtherance of their transport duties and work for the Defendant Companies, the Plaintiffs and other similarly situated truck drivers spent approximately thirty percent of their time or more commuting through the State of Illinois, regardless of whether Defendants' customers were in Illinois or not.

198. All of the instructions that the Plaintiffs and putative class members would receive came from Defendant Companies' dispatchers and management team in Illinois.

199. Defendant Companies controlled every aspect of their drivers', including Plaintiffs', work. Such control included, but was not limited to the following:

a. Defendant Companies required Plaintiffs and other similarly situated drivers to comply with instructions dictated by written and unwritten policies, procedures, and directives regarding Plaintiffs' and other similarly situated drivers' duties.

b. Plaintiffs, as well as other similarly situated drivers, were required to report to or contact dispatchers employed by the Defendant Companies in Illinois, at a pre-set time determined by Defendant Companies, at which time the Plaintiffs and other similarly situated drivers are provided with delivery assignments.

c. Defendant Companies' management instructed Plaintiffs and other similarly situated drivers which loads to pick up, the location of the loads/goods to be delivered, as well as the time frames for loading onto the equipment. Plaintiffs and other similarly situated drivers had and have no discretion with respect to which loads they would pick up or deliver or when. Additionally, the Defendant Companies dictated and dictate the time by which the delivery must be made.

d. Defendant Companies employed and employ managers who had supervisory responsibility over Plaintiffs and other similarly situated drivers, and who could and did assign and direct their work.

e. Plaintiffs and other similarly situated drivers were required to purchase and carry GPS devices, which allowed the Defendant Companies' personnel to track the drivers throughout the day or night. Defendant Companies' dispatchers and

supervisors also communicated with the Plaintiffs and similarly situated drivers while they were driving via telephone in order to convey instructions and otherwise oversee the drivers.

f. Defendant Companies required Plaintiffs and other similarly situated drivers to undergo background checks and drug testing.

g. Defendant Companies utilized a variety of insurance from an insurer of their choice, such as non-trucking liability insurance, occupational accident insurance, property damage and cargo insurance. While the drivers, including Plaintiffs, had no say in which insurance policies were chosen, they also had all of the related expenses deducted from their pay.

h. If the Plaintiffs or other similarly situated drivers wished to take time off, the Defendant Companies required them to give timely advance notice, with the Plaintiffs and other similarly situated drivers disciplined or terminated for failure to provide such notice.

i. Defendant Companies' personnel advised Plaintiffs and other similarly situated drivers that their refusal to drive a load that had been assigned to them would result in an immediate termination of their employment.

200. As part of their strict control over Plaintiffs' work, Individual Defendants required that the Plaintiffs and putative class members submit all bills of lading, logbooks, and other required paperwork to the Defendant Companies' head office in Illinois.

201. At no time during their employment were Plaintiffs and other similarly situated drivers allowed to have their own customers nor did they ever have their own customers. Further, they could not choose and did not choose their own routes for delivery of cargo, could not

and did not receive compensation or otherwise exchanged payment for their delivery other than being compensated by the Defendant Companies, and could not and did not negotiate any matters or bargains with any customers or brokers.

202. Plaintiffs and other similarly situated truck drivers shared similar job titles, followed the same policies and practices, performed similar duties, and as a result of Defendant Companies' common scheme of misclassification and applications of unlawful deductions, were similarly subject to exploitation and denied the promised and earned compensation.

**Liability of individual defendants Nazar Trukhan, Vitalii Ropii, and Yuriy Ropiy**

203. Defendants Trukhan, Ropii, and Ropiy had knowledge of the mutual assent between the Plaintiffs and Defendant Companies to compensate the Plaintiffs for all their work.

204. Defendants Trukhan, Ropii, and Ropiy similarly had knowledge of mutual assent between Defendant Companies and other drivers that came to work for the Defendant Companies and were interviewed by Defendant Companies' personnel responsible for hiring.

205. Individual Defendants further had knowledge of Defendant Companies' systematically misclassifying their drivers as independent contractors because Trukhan and Ropii were the ones to mastermind the misclassification scheme and the implemented it.

206. Defendants Trukhan, Ropii, and Ropiy knowingly permitted or otherwise caused Defendant Companies to wrongfully deny the payment of compensation to Plaintiffs and putative class members by actively and affirmatively directing the Defendant Companies' personnel to deny the earned and promised compensation, apply unlawful deductions to drivers' pay and deny the drivers' request to pay the final compensation and compensation for the last loads that the drivers would haul prior to termination of their employment.

207. All three individual Defendants established policies for Defendant Companies which violated the IWPCA: (1) at the beginning of running their transportation services enterprise, on or about 2016, when TRANS SOLUTION was founded, Trukhan and Ropii devised a scheme to misclassify the truck drivers as Independent Contractors and consequently, (2) underpay the truck drivers their earned compensation by applying deductions to the compensation of drivers; and (3) forced drivers and other personnel to doctor or otherwise falsify logs.

208. Defendants Trukhan, Ropii, and Yuriy Ropiy implemented their exploitative scheme in full knowledge that most of the truck drivers they hired would take the job offered, not complain about underpayment of wages, and not seek any recourse in court or otherwise with government authorities. Trukhan, Ropii, and Yuriy Ropiy targeted drivers who were and are recent immigrants, with limited English language skills and lack of ability to learn and understand the wage and hour laws in Illinois and the United States in general, so as to ensure a consistent power imbalance, which the individual Defendants used to their advantage and profit.

209. Instead of running an honest business, Defendants Trukhan, Ropii, and Yuriy Ropiy designed the above-described scheme of deductions and wage withholdings to take money from hard-working, vulnerable employees who could not or would not fight back.

210. Defendant Companies' practices, as set up and implemented by Individual Defendants, violated multiple provisions of the Illinois Wage Payment and Collection Act. In addition – but not a subject matter of the instant Complaint – Individual Defendants set up their enterprises as massive schemes to violate nearly a dozen of other state and federal laws, such as U.S. Department of Transportation regulations limiting the time the drivers can

operate their trucks on the road and proscribing minimum required rest time, Illinois laws on Worker's Compensation insurance, federal and state laws concerning payroll taxes, state laws requirement unemployment insurance contributions, Affordable Care Act, Immigration and Naturalization Act, and more.

211. As a result of Defendant Companies' unlawful practices, as set up and implemented by Individual Defendants, the Defendant Companies and Individual Defendants, as the sole shareholders of respectively owned Defendant companies, RUN DIRECT, TRANS SOLUTION and RT GROUP, profited immensely. They benefited from reduced labor and payroll costs by making illegal deductions and otherwise withholding pay from Plaintiffs and similarly situated drivers.

212. "Profited immensely" is an understatement. By organizing and implementing the scheme to skim the wages from companies' drivers, evade the payroll taxes, evade compliance with U.S. DOT regulations, evade mandatory insurance contributions to Workers Comp and state unemployment insurance, Individual Defendants grossly violated Illinois and Federal laws, the workers' rights, people of the state of Illinois and of the United States. The enormous and unprecedented profits resulting from such skimming and evasion, were pocketed by Trukhan, Ropii, and Yuriy Ropiy, and further laundered, with the implication of their families and other co-conspirators, through purchases of exuberant-costly real estate – residential, as well as investment properties, summer cottages, development projects, worth between $250,000 and $2,500,000, taking title with their spouses and relatives, who are also management employees or contractors of the Defendant Companies, (Vitalii Ropii owns at least four real estate properties purchased for from $230,000 to $2,350,000, while Trukhan owns at least two properties purchased for from $204,000 to

$1,740,000), the luxury cars (Vitalii Ropii owns a $300,000 McLaren, a $200,000 Lamborghini, and a $150,000 Porshe, while Trukhan – a $99,000 BMW and a $62,000 Mercedes Benz).

213. As a result of Individual Defendants' unlawful and willful actions causing the Corporate Defendants to fail to pay Plaintiffs and others similarly situated in accordance with the requirements of the IWPCA, Plaintiffs and others similarly situated putative class members suffered lost wages and other actual damages.

**CLASS ALLEGATIONS**

214. Plaintiffs bring these claims for relief on their own and as a class action pursuant to Fed R. Civ. P. 23. The class is defined as:

*"All persons who have worked for Defendant Companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant Companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and who entered into an Independent Contractor agreement individually or on behalf of another entity, oral or written, and personally provided freight cargo transportation services pursuant to that Agreement for Defendant Companies and who have not been classified as employees of Defendant Companies".* (Counts I and II).

*"All persons who have worked for Defendant Companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant Companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and personally provided freight cargo transportation services, against whom the Individual Defendants, on behalf of*

*themselves and their respective Corporate Defendants, committed Civil Conspiracy to violate IWPCA and IMWL."* (Counts III and IV).

*"All persons who have worked for Defendant company as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant company's, their predecessors', successors', subsidiaries' and/or affiliated company's trucks at any time during the relevant statutory period, and who entered into an Independent Contractor agreement individually or on behalf of another entity, oral or written, and personally provided freight cargo transportation services pursuant to that Agreement for Defendant company and who have not been classified as employees of Defendant company and against whom violations under FSLA were committed in that at least minimum wage was not paid during some periods of work". (Count V).*

*"All persons who have worked for Defendant company as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant company's, their predecessors', successors', subsidiaries' and/or affiliated company's trucks at any time during the relevant statutory period, and who entered into an Independent Contractor agreement individually or on behalf of another entity, oral or written, and personally provided freight cargo transportation services pursuant to that Agreement for Defendant company and who have not been classified as employees of Defendant company and against whom Individual Defendants committed Civil Conspiracy to violate FSLA rights but denying at least minimum wages be paid during some periods of work". (Count V).*

215. This action is properly maintainable as a class action under Rules 23(a) and 23(b) because:

a. The class or subclasses of plaintiffs, estimated 1,000 drivers, is so numerous that joinder of all members is impracticable.

b. There are common questions of law and fact as to whether Defendant Companies improperly misclassified the drivers as independent contractors in violation of Section 2 of IWPCA, Minimum Wage provisions of FLSA, as the drivers were and are in fact covered by the IWPCA and FLSA; whether the drivers are entitled to recover the amounts deducted by the Company from their wages in violation of Section 9 of IWPCA and Section 206 of FLSA, as well as any unpaid but earned compensation; whether Defendants did not reimburse the drivers for work-related expenses in accordance with Section 9.5 of IWPCA; whether the proposed class members are entitled to statutory interest and attorney's fees and costs under Section 14 of IWPCA, and whether Individual Defendants are liable under IWPCA (Count I) as well as for the common law conspiracy to commit IWPCA violations (Count III).

c. All claims arise from the same practice or course of conduct of the Corporate and Individual Defendants and are based on the same theory, and therefore the claims are typical.

d. Each driver has the same potential claim and types of damages, and these common questions of law and fact predominate over any possible questions affecting only individual members. As determination of liability under IWPCA for misclassification, failure to pay for all work done, and unlawful deductions does not require individualized and fact intensive inquiry; and thus, the proposed class is sufficiently cohesive to warrant adjudication by representation.

e. The named Plaintiffs and their attorney will adequately protect the interests of the entire class.

f. Class treatment in this particular case is the only appropriate means for the fair and efficient adjudication of the controversy because of the length of the dispute, the intimidation and retaliation threats and actions by Individual Defendants, the amount of individual damages and the prohibitive costs of individual suits. Further, the putative class members' interests in individually controlling the prosecution of separate actions is minimal, the potential individual recoveries in this case are small enough to warrant class action treatment and this forum is the only appropriate forum for such an action because one named Plaintiff, as well as some other drivers-members of the putative class, reside in this District and the unlawful practices alleged by Plaintiffs occurred within Illinois and which affected the rights of all members of the putative class who worked for the Defendant Companies during the statutory period of time.

**COUNT I: VIOLATIONS OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT, 820 ILCS 115/ – AGAINST ALL DEFENDANTS**

216. Plaintiffs re-allege and incorporate paragraphs 1 through 215 above as and for paragraph 216 of this Count I.

217. Each corporate Defendant is an "employer" within the meaning of Section 115/2 of IWPCA. Each individual Defendant is an "employer" within the meaning of Section 115/2 of the IWPCA.

218. Defendants violated Section 115/2 of the IWPCA by misclassifying Plaintiffs and those similarly situated.

219. Defendants violated Section 115/3 and Section 115/4 of the IWPCA by failing to pay Plaintiffs and those similarly situated their wages in a timely manner.

220. Defendants violated Section 115/5 of the IWPCA by failing to pay Plaintiffs their final compensation in full and in a timely manner.

221. Defendants violated Section 115/9 of the IWPCA by making unauthorized deductions from the paychecks of Plaintiffs and those similarly situated. These deductions were not required by law, did not benefit Plaintiffs, were not made in response to a valid wage assignment order, and were not made with the express written consent of employees.

222. Defendants violated Section 115/9.5 of the IWPCA for failing to reimburse Mr. Zhavoronkov and other employees-drivers who worked for corporate Defendants since January 1, 2019 for all necessary expenditures or losses incurred by the employees-drivers within the corporate Defendants' scope of employment and directly related to services performed for the Defendant Companies beginning with January 1, 2019.

223. Defendants violated Section 115/10 of the IWPCA by failing to notify Plaintiffs and those similarly situated of their true rate of pay in writing or orally at any point of hiring and employment.

224. The total amount Mr. Bohdan’s damages for the five months of his employment with Defendant Companies is approximately $18,790.00 without interest accrued, and $26,306 with interest accrued to date but excluding attorney’s fees and costs.

225. The total amount of Plaintiff Zhavoronkov’s damages for the twenty months of his employment with Defendant Companies is approximately $29,104.72, and in the time since these deductions were taken, $36,380.90 with statutory interest under the IWPCA has accrued.

226. The total amount of Plaintiff Nikitiuk's damages for the twenty months of his employment with Defendant Companies is approximately $27,261, and in the time since these deductions were taken, $38,165.40 with statutory interest under the IWPCA has accrued.

227. The total amount of Plaintiff Chemerinskyi's damages for the twenty months of his employment with Defendant Companies is approximately $32,564, and in the time since these deductions were taken, $40,705 with statutory interest under the IWPCA has accrued.

228. The total amount of Plaintiff Buchinskyi's damages for the twenty months of his employment with Defendant Companies is approximately $29,913.72, and in the time since these deductions were taken, $43,374.89 with statutory interest under the IWPCA has accrued.

229. The total amount of Plaintiff Koptsiukh's damages for the twenty months of his employment with Defendant Companies is approximately $22,271.81, and in the time since these deductions were taken, $28,953.35 with statutory interest under the IWPCA has accrued.

230. The total amount of Plaintiff Rybchenko's damages for the twenty months of his employment with Defendant Companies is approximately $13,308, and in the time since these deductions were taken, $14,638.80 with statutory interest under the IWPCA has accrued.

231. The total amount of Plaintiff Pyvovarov's damages for the twenty months of his employment with Defendant Companies is approximately $5,960, and in the time since these deductions were taken, $12,218 with statutory interest under the IWPCA has accrued.

232. The total amount of Plaintiff Metelkin's damages for the twenty months of his employment with Defendant Companies is approximately $19,071.64, and in the time since these deductions were taken, $26,700.30 with statutory interest under the IWPCA has accrued.

233. Individual Defendants Trukhan,Ropii, and Ropiy are personally liable for the corporate Defendants' violations of the IWPCA, pursuant to Section 115/13 of the IWPCA because they intentionally or otherwise knowingly permitted Corporate Defendants to violate IWPCA.95. Pursuant to Section 115/14 of the IWPCA, all four Defendants are liable to Plaintiffs and members of the putative class for all interest accrued, and for all attorney's fees and costs incurred and to be incurred as a result of prosecution of the instant Complaint.

**PRAYER FOR RELIEF COUNT I:**

WHEREFORE, Plaintiffs pray that this Honorable Court finds that:

a. At all relevant times, Corporate Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION have acted in violation of the Illinois Wage Payment and Collections Act and finds RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION severally liable for violations of IWPCA against all Plaintiffs and similarly situated drivers.

b. Hold RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION liable to all Plaintiffs for damages for violations of Sections 2, 3, 4, 9 and 9.5 of the IWPCA in the amount of **$198,244.89**.

c. Hold RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION, as employer of all Plaintiffs, liable for interest that accrued and shall accrue through the

day of the Judgment per Section 14 of IWPCA, which shall continue to accrue through and post the date of the Judgment until all past due and unpaid wages are repaid.

d. Hold all defendants jointly and severally liable for attorney's fees and costs pursuant to Section 14 of IWPCA, which shall accrue through the date of the Judgment.

e. Find and hold that Individual Defendants Nazar Trukhan,Vitalii Ropii, and Yuriy Ropiy knowingly caused the Corporate Defendants to violate the IWPCA and Plaintiffs' rights thereunder and are jointly and severally liable to Plaintiffs, pursuant to Section 13 of IWPCA, for all damages to Plaintiffs pled in Count I of this Class Action Complaint.

f. Certify the class pursuant to allegations herein and hold RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION, as an employer of Plaintiffs and other similarly situated drivers-members of the putative class, liable to class members in the amount in access of **$5,000,000.00**, exclusive of statutory interest and attorney's fees and costs under Section 14 of IWPCA, which presently is estimated at a $10,000,000 in statutory interest and attorney's fees and costs.

g. Hold Individual Defendants jointly and severally liable for punitive damages in excess of $50,000 as the trier of fact may determine.

**COUNT II, VIOLATIONS OF ILLINOIS MINIMUM WAGE LAW 820 ILCS §105/ET SEQ – AGAINST ALL DEFENDANTS**

234. Plaintiffs reallege and incorporate paragraphs 1 through 233 as for his paragraph 234 of Count III.

235. At all times relevant hereto Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION was the employer of Plaintiffs within the meaning of Section 3(c) of

IMWL (820 ILCS 105/3).

236. At all times relevant hereto Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION were the employers of Plaintiffs and directed and controlled the work of Plaintiffs.

237. At all times relevant hereto Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION are subjects to the provisions of IMWL because they are registered in Illinois, having principal place of business in Illinois and hire employees to work for this company in Illinois.

238. At all times relevant hereto Individual Defendants Nazar Trukhan,Vitalii Ropii, and Yuriy Ropiy were the employers of Plaintiffs within the meaning of Section 3(c) of IMWL as those individual defendants were the persons acting directly in the interests of their respectively owned and operated entities, Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION, which are the employers in relation to employees-Plaintiffs.

239. At all times relevant hereto Plaintiffs were employees of Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION within the meaning of Section 3(d) of IMWL.

240. At all times relevant hereto Plaintiffs and similarly situated drivers were a truck drivers who were denied wages or compensation for the periods of their work.

241. Defendant Companies and Individual Defendants violated Section 4 of IMWL by not paying the minimum wage to Plaintiffs and similarly situated drivers.

242. Defendant Companies and Individual Defendants are liable under Section 12 of IMWL all wages that they were unpaid at least the minimum wage in Illinois, and Plaintiffs seek

to recover the amount of unpaid wages plus 5% of the any such underpayments for each month following the date when such wages were due but unpaid, as well as all attorney's fees and costs.

243. Hence, pursuant to 820 ILCS 105/12, Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION and Individual Defendants are liable to Plaintiffs in the amount of **$198,244.89**, plus 5% interest accrued monthly. In total, Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION and Individual Defendants are liable to Plaintiffs under 820 ILCS 105/12 for **$267,442.64**.

**PRAYER FOR RELIEF COUNT II:**

WHEREFORE, Plaintiffs pray that this Honorable Court finds that at all relevant times,

a. Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION have acted in violation of the Illinois Minimum Wage Law, 820 ILCS 105/, by refusing the pay minimum wage to the Plaintiffs and similarly situated drivers;

b. that the Individual Defendants are individually liable as employers under this act pursuant to 820 ILCS 105/3(c);

c. award Plaintiffs actual and compensatory damages pursuant to 820 ILCS 105/12 in the amount of **$267,442.64**, plus interest that continues to accrue since the filing of this action and all reasonable attorney's fees and costs;

d. hold each Defendant – the Corporate Defendants and Individual Defendants - severally and jointly liable for this amount to the Plaintiffs;

e. Certify the class pursuant to allegations herein and hold Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION, as employers of Plaintiffs and other similarly situated drivers-members of the putative class, liable to class members

in the amount in access of **$5,000,000.00**, exclusive of statutory interest and attorney's fees and costs under IMWL.

f. Hold all defendants jointly and severally liable for punitive damages in excess of $50,000 as the trier of fact may determine.

## COUNT III: CIVIL CONSPIRACY TO COMMIT IWPCA VIOLATIONS, BROUGHT– AGAINST DEFENDANTS TRUKHAN, ROPII, AND YURIY ROPIY

244. Plaintiffs re-allege and incorporate paragraphs 1 through 243 above as and for paragraph 244 of this Count III.

245. At the time when Defendants Trukhan, Ropii and Ropiy incorporated and set up RT GROUP LOGISTICS INC in 2013, these three individual Defendants entered into an agreement with each other to set up a scheme to hire truck drivers to operate the equipment that Trukhan, Ropii, and Yuriy Ropiy would buy via their corporate entities, misclassify them as independent contractors as opposed to employees as to avoid responsibilities owed to the employees under federal and state laws, including the IWPCA, and to further be held unaccountable for taking unlawful deductions, chargebacks of expenses, fines and penalties from their drivers.

246. Individual Defendants knew that they would mislead the drivers who would apply for jobs at RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION, and knowingly agreed to implement their scheme to misclassify and underpay their drivers who would come to work for the Defendant Companies.

247. Individual Defendants knew all laws that they were intending to violate as the U.S. Department of Transportation, before issuing to a trucking company the Motor Carrier

Authority publishes, to all prospective applicants, series of legal notices and publications on the laws which trucking companies must comply with. They also knew that as executives of a corporation, they and their enterprise must comply with the wage laws, as the Secretary of State of Illinois notifies business owners at time of incorporation and/or registration of business entities, via website and print handouts, of the requirements under the wage laws, worker's compensation, unemployment commission regulations, and other laws and regulations businesses such as RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION must comply with.

248. Individual Defendants knew that to implement and further their scheme to skim their employees' wages, violate the IWPCA and other state and federal laws, they would need to be in an agreement and act in concert. This agreement that they entered circa 2013, included the implementation of misclassification and underpayment schemes.

249. Once the Individual Defendants began operating RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION, they implemented their scheme to misclassify the truck drivers as independent contractors, withhold the compensation from truck drivers by taking dubious deductions from drivers' pay, and deny payment of compensation in a timely manner.

250. In furtherance of their conspiracy, Individual Defendants acted in concert to ensure that all their subordinates at RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION, and then at the respectively owned Defendant companies, such as managers, HR, safety department, dispatchers and other employees, complied with Individual Defendants' instructions part of the implementation of their scheme to misclassify drivers and skim the drivers' wages.

251. Individual Defendants committed overt acts in furtherance of the common scheme by enabling the Defendant Companies to advertise job positions, interviewing the named Plaintiffs and others similarly situated, hiring them but then misclassifying them as independent contractors, by not paying them the wages they earned and were promised at hiring that they would earn

252. Individual Defendants knew about job application by each named Plaintiff, conspired to misclassify each named Plaintiff and then underpay the compensation that each named Plaintiff would earn, and directed their subordinate personnel to apply dubious deductions to the named Plaintiffs' pay in violation of IWPCA.

253. By their actions, as a result of their conspiracy to violate IWPCA, Individual Defendants caused and continue to cause injury to the named Plaintiffs and others similarly situated as the promised and earned compensation remains unpaid.

254. Each Individual Defendant, being the sole owner/shareholder of respective corporate Defendant, acted in their own interests and for their own benefit when entering into conspiracy to violate IWPCA and when taking steps in furtherance of said conspiracy.

255. Individual Defendants committed civil conspiracy against Plaintiffs and putative class members. Namely, to violate Illinois Wage Payment and Collection Act.

256. That in addition to the amount of wages and/or final compensation the Individual Defendants owe Plaintiffs and other similarly situated drivers as a result of their conspiracy to violate IWPCA, and attorneys' fees and costs incurred as a result of this action, Plaintiffs and others similarly situated drivers are also entitled to punitive damages because:

  g. Individual Defendants knowingly and willfully committed conspiracy to violate Plaintiffs' and other similarly situated drivers' rights under the IWPCA.

h. The commission of civil conspiracy in Illinois is an intentional tort, and also is a violation of Illinois Wage Payment and Collection Act, the law that concerns the public interest and not just the individual interest, e.g. the law aimed to protect all employees in the State of Illinois, whereby the knowingly and willingly committed violation of that Act may also be punishable in criminal court pursuant to 820 ILCS 115/14; and

i. Individual Defendants' civil conspiracy was and is a deliberate attempt to lure Plaintiffs and other similarly situated drivers into working for Defendant Companies without due compensation for their service, as well as annoy, harass, oppress, and intimate Plaintiffs and others similarly situated - who do not have the financial and legal resources that the Defendants have at their disposal - into abandoning a legal right which Plaintiffs and others similarly situated properly asserted (i.e. to be paid the compensation by their employer which, by all accounts, they have earned and which is due and owing pursuant to the Illinois Wage Payment and Collection Act).

257. Defendants' conspiracy against Plaintiffs is vexatious, harassing, and in bad faith.

258. Individual Defendants have knowingly and willfully committed conspiracy to violate IWPCA, which is a public interest law.

259. The commission of civil conspiracy in Illinois is an intentional tort.

260. Severe, knowing, and repeat Violations of Illinois Wage Payment and Collection Act, whereby a knowingly and willingly committed violation of that Act took place, also constitutes a criminal violation of the laws of this state (820 ILCS 115/14); and

261. Individual Defendants' civil conspiracy was and is a deliberate attempt to lure Plaintiffs

and similarly situated drivers into working for Defendant companies without due compensation for their service, as well as annoy, harass, oppress, and intimate Plaintiffs and similarly situated drivers - who do not have the financial and legal resources that the Individual Defendants have at their disposal - into abandoning a legal right which Plaintiffs asserted (i.e. to be paid the compensation by their employer which, by all accounts, they have earned and which is due and owing pursuant to the Illinois Wage Payment and Collection Act).

**PRAYER FOR RELIEF COUNT III:**

WHEREFORE, Plaintiffs respectfully requests that this Court certifies the class, finds Individual Defendants Nazar Trukhan,Vitalii Ropii, and Yuriy Ropiy jointly and severally liable to the Plaintiffs and the putative class for Civil Conspiracy to commit IWPCA violation, awards Plaintiffs their actual damages as set forth in Count I, namely the actual damages in excess of $198,244.89, and the putative class in the amount of $5,000.000.00; and awards all costs and attorney's fees and prejudgment interest and awards punitive damages as decided by the trier of fact.

**COUNT IV: All Plaintiffs against Individual Defendants Nazar Trukhan,Vitalii Ropii, and Yuriy Ropiy: CIVIL CONSPIRACY TO VIOLATE THE ILLINOIS MINIMUM WAGE LAW – 820 ILCS §105/et seq.**

262. Plaintiffs re-allege and incorporate paragraphs 1–261 above as and for paragraph 262 of this Count IV.

263. In or around 2013, Individual Defendants Nazar Trukhan,Vitalii Ropii, and Yuriy Ropiy entered into an agreement among themselves to engage in a scheme to underpay employees, including Plaintiffs, in violation of the Illinois Minimum Wage Law, 820 ILCS

105/1 et seq., and to act in concert to ensure their corporate entities, Defendants RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION, would not comply with their legal obligations to pay minimum wages.

264. Individual Defendants developed and implemented a plan to misclassify truck drivers as independent contractors, to deny or withhold compensation for hours worked, and to avoid payment of wages owed under the IMWL, including overtime and minimum wage, with knowledge that such actions violated the law.

265. Individual Defendants knew that Plaintiffs and similarly situated employees were entitled to minimum wage and overtime pay under the IMWL and had no lawful right to withhold, underpay, or delay payment of wages.

266. To further their scheme, Individual Defendants acted in concert, including by setting company policies, directing managers, approving payroll practices, and ensuring that Plaintiffs and other employees were not paid wages in accordance with Illinois law.

267. Individual Defendants committed overt acts in furtherance of this conspiracy by: advertising and hiring Plaintiffs and other drivers; misclassifying them as independent contractors; assigning them work that exceeded 60 hours per week; paying them far less than the legally mandated minimum wage; and failing to maintain accurate payroll records.

268. As a direct and proximate result of the Individual Defendants' conspiracy, Plaintiffs and other employees suffered injury, including unpaid minimum wages, lost overtime compensation, financial hardship, and related economic damages.

269. Individual Defendants' conspiracy was knowing, deliberate, and in bad faith, intentionally designed to deprive Plaintiffs and similarly situated employees of wages earned under the IMWL.

270. Plaintiffs are entitled to recover all unpaid wages, liquidated damages as permitted under 820 ILCS 105/12, attorneys' fees, costs, and any other relief deemed appropriate by the Court, including interest on the amounts due, and any punitive damages available for intentional violations of public interest wage laws.

**PRAYER FOR RELIEF COUNT IV:**

WHEREFORE, Plaintiffs respectfully request that this Court certifies the class, finds Individual Defendants Nazar Trukhan,Vitalii Ropii, and Yuriy Ropiy jointly and severally liable to the Plaintiffs and the putative class for Civil Conspiracy to commit IMWL violation, awards Plaintiffs their actual damages as set forth in Count IV, namely the actual damages in excess of $$35,447.54, and $5,000,000 to the putative class, and awards all costs and attorney's fees and prejudgment interest and awards punitive damages as decided by the trier of fact.

**COUNT V: VIOLATIONS OF FAIR LABOR STANDARD ACT, 29 U.S.C. 201 et Seq., Fair Labor Standard Act, 29 U.S.C. 201 et Seq.**

271. Plaintiffs re-allege and incorporate paragraphs 1 through 270 above as and for paragraph 271 of this Count V.

272. At any and all times relevant hereto, Corporate Defendants RUN DIRECT, RT GROUP, and TRANS SOLUTION were and are "enterprises in commerce" within the meaning of Sec. 3 of the FLSA, 29 U.S.C. 203.

273. At all times relevant hereto Defendants RUN DIRECT, RT GROUP, and TRANS SOLUTION were the employers of Plaintiffs and class members they seek to represent, within the meaning of Section 203 of FLSA.

274. At all times relevant hereto Defendants Trukhan, Ropii, and Yuriy Ropiy were the employers of Plaintiffs and putative class members they seek to represent, within the

meaning of Section 203 of FLSA as those individual defendants acted directly in the interests of their respectively owned and/or operated or managed entities, Defendants RUN DIRECT, RT GROUP, and TRANS SOLUTION, which were the employers in relation to employee-Plaintiffs and other similarly situated putative class members.

275. At all times relevant hereto Plaintiffs and the class they seek to represent were and/or are employees of Defendants RUN DIRECT, RT GROUP, and TRANS SOLUTION within the meaning of Section 203(e)(1) of FLSA.

276. During the course of their employment, Plaintiffs and the class they seeks to represent were truck drivers who were denied wages or compensation for some days of the workweeks or work periods entirely.

277. Plaintiff Bohdan was underpaid for his work by at least $4,512, excluding accrued interest and other penalties under FLSA.

278. Plaintiff Zhavoronkov was underpaid for his work by at least $7,148.72, excluding accrued interest and other penalties under FLSA.

279. Plaintiff Nikitiuk was underpaid for his work by at least $6,329, excluding accrued interest and other penalties under FLSA.

280. Plaintiff Chemerinskyi was underpaid for his work by at least $9,506, excluding accrued interest and other penalties under FLSA.

281. Plaintiff Buchinskyi was underpaid for his work by at least $1,477.84, excluding accrued interest and other penalties under FLSA.

282. Plaintiff Koptsiukh was underpaid for his work by at least $4,623.81, excluding accrued interest and other penalties under FLSA.

283. Plaintiff Rybchenko was underpaid for his work in amount of $6,976, excluding accrued interest and other penalties under FLSA.

284. Plaintiff Metelkin was underpaid for his work by at least $2,015.74, excluding accrued interest and other penalties under FLSA.

285. As a result, Plaintiffs were not paid at least a minimum wage for their work for Defendants, which the federal law mandated in 2023 as $7.25 per hour.

286. The statutory interest 5% per month continues to accrue on all unpaid minimum wages and the Defendants are liable for liquidated damages under FLSA in addition to the unpaid wages and statutory interest.

287. At all times relevant thereto Plaintiffs believe there were other similarly situated former employees-truck drivers working for Defendants who were unpaid for some of the work that they performed to the extent of not being paid at least a minimum wage mandated by Federal Law.

288. Defendants violated Section 206 of FLSA by failing to pay at least a minimum wage to Plaintiffs and committed similar violations against putative class members he seeks to represent.

289. As a direct and proximate result thereof, there is due to Plaintiffs and putative class members back wages and penalties – liquidated damages and statutory damages - pursuant to Section 216 of FLSA.

290. Plaintiffs and class they seek to represent are entitled to recover double the amount of unpaid wages due to them, as well as all attorney's fees and costs, pursuant to Section 216 of FLSA.

**PRAYER FOR RELIEF COUNT V:**

WHEREFORE, Plaintiffs pray that this Honorable Court:

a. Finds that the Corporate defendants violated the Fair Labor Standard Act, 29 U.S.C. 201 et Seq.;

b. Holds Corporate defendant liable for all damages caused to Named Plaintiffs and members of the class in an amount in excess of $5,000,000.00;

c. Imposes penalties by way of liquidated damages and interest under FLSA;

d. Awards all attorney's fees and costs in this litigation to Plaintiffs pursuant to FLSA;

e. Finds that Individual defendants Trukhan, Ropii, and Yuriy Ropiy are personally liable for the Corporate defendant' violations under FLSA;

f. Holds Individual defendants Trukhan, Ropii, and Yuriy Ropiy liable for damages caused to Plaintiffs and members of the putative class in excess of $5,000,000.00.

g. Grants such other relief as this Court deems appropriate.

**COUNT VI: CIVIL CONSPIRACY TO COMMIT FLSA VIOLATIONS, BROUGHT– AGAINST INDIVIDUAL DEFENDANTS TRUKHAN, ROPII, AND ROPIY**

291. Plaintiffs re-allege and incorporate paragraphs 1 through 290 above as and for paragraph 291 of this Count VI.

292. At the time when Defendants Trukhan, Ropii, and Yuriy Ropiy incorporated and set up RT GROUP LOGISTICS INC in 2013, these three individual Defendants entered into an agreement with each other to set up a scheme to hire truck drivers to operate the equipment that Trukhan,Ropii and Ropiy would buy via their corporate entities, misclassify them as independent contractors as opposed to employees as to avoid responsibilities owed to the employees under federal and state laws, including the FLSA, and to further be held

unaccountable for taking unlawful deductions, chargebacks of expenses, fines and penalties from their drivers.

293. Individual Defendants knew that they would mislead the drivers who would apply for jobs at RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION, and knowingly agreed to implement their scheme to misclassify and underpay their drivers who would come to work for the Defendant Companies.

294. Individual Defendants knew all laws that they were intending to violate as the U.S. Department of Transportation, before issuing to a trucking company the Motor Carrier Authority publishes, to all prospective applicants, series of legal notices and publications on the laws which trucking companies must comply with. They also knew that as executives of a corporation, they and their enterprise must comply with the wage laws, as the Secretary of State of Illinois notifies business owners at time of incorporation and/or registration of business entities, via website and print handouts, of the requirements under the wage laws, worker's compensation, unemployment commission regulations, and other laws and regulations businesses such as RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION must comply with.

295. Individual Defendants knew that to implement and further their scheme to skim their employees' wages, violate the FLSA and other state and federal laws, they would need to be in an agreement and act in concert. This agreement that they entered circa 2013, included the implementation of misclassification and underpayment schemes.

296. At all times relevant hereto Defendants Trukhan, Ropii, and Ropiy were the employers of Plaintiffs and putative class members they seek to represent, within the meaning of Section 203 of FLSA as those individual defendants acted directly in the interests of their

respectively owned and/or operated or managed entities, Defendants RUN DIRECT, RT GROUP, and TRANS SOLUTION, which were the employers in relation to employee-Plaintiffs and other similarly situated putative class members.

297. In furtherance of their conspiracy, Individual Defendants acted in concert to ensure that all their subordinates at RUN DIRECT, RT GROUP LOGISTICS, and TRANS SOLUTION, and then at the respectively owned Defendant companies, such as managers, HR, safety department, dispatchers and other employees, complied with Individual Defendants' instructions part of the implementation of their scheme to skim the drivers' wages.

298. By their actions, as a result of their conspiracy to violate FLSA, Individual Defendants caused and continue to cause injury to the named Plaintiffs and others similarly situated as the promised and earned compensation remains unpaid.

299. Each Individual Defendant, being the sole owner/shareholder of respective corporate Defendant, acted in their own interests and for their own benefit when entering into conspiracy to violate FLSA and when taking steps in furtherance of said conspiracy.

300. Individual Defendants committed civil conspiracy against Plaintiffs and putative class members. Namely, to violate Fair Labor Standard Act.

301. Plaintiff Bohdan was underpaid for his work by at least $4,512, excluding accrued interest and other penalties under FLSA.

302. Plaintiff Zhavoronkov was underpaid for his work by at least $7,148.72, excluding accrued interest and other penalties under FLSA.

303. Plaintiff Nikitiuk was underpaid for his work by at least $6,329, excluding accrued interest and other penalties under FLSA.

304. Plaintiff Chemerinskyi was underpaid for his work by at least $9,506, excluding accrued interest and other penalties under FLSA.

305. Plaintiff Buchinskyi was underpaid for his work by at least $1,477.84, excluding accrued interest and other penalties under FLSA.

306. Plaintiff Koptsiukh was underpaid for his work by at least $4,623.81, excluding accrued interest and other penalties under FLSA.

307. Plaintiff Rybchenko was underpaid for his work in amount of $6,976, excluding accrued interest and other penalties under FLSA.

308. Plaintiff Metelkin was underpaid for his work by at least $2,015.74, excluding accrued interest and other penalties under FLSA.

309. Defendants' conspiracy against Plaintiffs is vexatious, harassing, and in bad faith.

310. Individual Defendants have knowingly and willfully committed conspiracy to violate FLSA, which is a public interest law.

311. The commission of civil conspiracy in Illinois is an intentional tort.

312. Severe, knowing, and repeat Violations of Fair Labor Standard Act, whereby a knowingly and willingly committed violation of that Act took place, also constitutes a criminal violation of the laws of this state (820 ILCS 115/14); and

313. Individual Defendants' civil conspiracy was and is a deliberate attempt to lure Plaintiffs and similarly situated drivers into working for Defendant companies without due compensation for their service, as well as annoy, harass, oppress, and intimate Plaintiffs and similarly situated drivers - who do not have the financial and legal resources that the Individual Defendants have at their disposal - into abandoning a legal right which Plaintiffs asserted (i.e. to be paid the compensation by their employer which, by all

accounts, they have earned and which is due and owing pursuant to the Fair Labor Standard Act).

**PRAYER FOR RELIEF COUNT VI:**

WHEREFORE, Plaintiffs respectfully requests that this Court certifies the class, finds Individual Defendants Nazar Trukhan,Vitalii Ropii, and Yuriy Ropiy jointly and severally liable to the Plaintiffs and the putative class for Civil Conspiracy to commit FLSA violation, awards Plaintiffs their actual damages as set forth in Count VI, namely the actual damages in excess of $35,447.54, and the putative class in the amount of $5,000.000.00; and awards all costs and attorney's fees and prejudgment interest and awards punitive damages as decided by the trier of fact.

Respectfully submitted,

By:__/s/ Julia Bikbova__________________
Julia Bikbova, Plaintiffs' Attorney

Julia Bikbova
Bikbova Law Offices, P.C.
666 Dundee Road, Suite 708
Northbrook, IL 60062
(847) 730-1800
julia@bikbovalaw.com
ARDC# 6291400